Anna T. Neill, Esq. (SBN 270858)
SPERLING KENNY NACHWALTER, LLC
Four Seasons Tower
1441 Brickell Avenue, Suite 1100
Miami, FL 33131
Telephone:   (305) 373-1000
Facsimile:   (305) 371-1861
Email:       aneill@sperlingkenny.com

Attorney for Plaintiffs MH Sub I, LLC,
d/b/a Internet Bands, WebMD Health Corp.,
and WebMD LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MH SUB I, LLC, D/B/A INTERNET BRANDS, WEBMD HEALTH CORP., AND WEBMD LLC, | Case No. |
| *Plaintiffs*, | **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** |
| -AGAINST- | **DEMAND FOR JURY TRIAL** |
| GOOGLE LLC and ALPHABET INC., | |
| *Defendants*. | |

COMPLAINT                                           1

Plaintiffs MH Sub I, LLC, d/b/a Internet Brands, WebMD Health Corp., and WebMD LLC, bring this action against Google LLC and Alphabet Inc. (together, "Google") for willfully acquiring and maintaining monopoly power in the open-web display publisher ad server market and the open-web display ad exchange market in violation of Section 2 of the Sherman Act, and for unlawfully tying its publisher ad server and ad exchange in violation of Sections 1 and 2 of the Sherman Act. Plaintiffs seek relief under Section 4 of the Clayton Act, 15 U.S.C. § 15(a) and California law for the injuries and damages it sustained as a direct result of Google's unlawful conduct, along with such other relief as provided by law, including treble damages, costs of this lawsuit, and reasonable attorneys' fees.

## I.    NATURE OF THIS ACTION

1.    MH Sub I, LLC, d/b/a Internet Brands, is a digital content and marketing company that, among other things, owns the domain names, websites, and businesses of numerous websites, including WebMD, the leading website for health conditions and concerns for consumers in the United States and internationally. Since launching in 1998, Internet Brands has grown to become the leading digital franchise focused on large vertical markets. It proudly combines the innovation of a start-up with the stability, benefits and profitability of an established corporation. Internet Brands is managed and operated out of the company's principal offices in El Segundo, California.

2.    Plaintiffs monetize the quality of the content produced and hosted on their websites through advertising. Plaintiffs advertise on their websites, which are viewed by millions of visitors every year.

3.    Plaintiffs design their websites with spaces reserved for display advertising. Each reserved space or slot is a unique opportunity for an advertiser to provide an impression to the consumer. Each publisher's set of reserved advertising space is collectively called its ad inventory.

COMPLAINT                                    2



Fig 1. Display Ad Inventory Example[1]

4. For Plaintiffs, the need to sell ad inventory online means the need to do business with Google.

5. Google dominates the online advertising landscape, including digital "display ads," for which Google acts as a middleman and a gatekeeper at three different levels. First, to publishers, Google offers the tools and services to sell ad inventory through Google's publisher ad server. Second, for advertisers, Google offers tools and services that allow advertisers to make bids for their advertisements to be displayed. Finally, Google operates the middle ground, the ad exchange, which facilitates auction of ad inventory.

6. Google has systematically and "willfully engaged in a series of anticompetitive acts to acquire and maintain monopoly power" in two of the three levels: "the publisher ad server and the ad exchange markets." *United States v. Google LLC*, 778 F. Supp. 3d 797, 873 (E.D. Va. 2025). Google established its market power and maintained its monopolies through strategic acquisition, deception, exclusion, and the unlawfully tying of its "publisher ad server and ad exchange together through contractual policies and technological integration." *Id.*

---

[1] Unless otherwise noted, the figures used in this complaint are reproduced from the operative complaint in *Texas v. Google, LLC* (4:20-cv-00957) (E.D. Tex.), with some modifications.

COMPLAINT                                      3

7.    Historically, publishers such as Plaintiffs have had the ability to select among the advertisers who compete to be displayed in Plaintiffs' ad inventory. For Plaintiffs' websites today, Google, not Plaintiffs, has final control over the ad selection process, which includes controlling the prices that Plaintiffs earn from advertisers.

8.    On April 17, 2025, Judge Brinkema in the United States District Court for the Eastern District of Virginia found, following a three-week bench trial, that Google "violated Section 2 of the Sherman Act by willfully acquiring and maintaining monopoly power in the open-web display publisher ad server market and the open-web display ad exchange market, and [] unlawfully tied its publisher ad server (DFP) and ad exchange (AdX) in violation of Sections 1 and 2 of the Sherman Act." *United States v. Google LLC*, 778 F. Supp. 3d at 810.

9.    Google's "exclusionary conduct substantially harmed Google's publisher customers." *Id.* at 873. Those "publisher customers" include Plaintiffs. After Google illegally acquired its monopolies, it pivoted from serving the interests and preferences of its publisher customers to advancing the interest of its own platforms at the publishers' expense.

10.    Google used and uses its monopoly power to charge Plaintiffs supracompetitive fees, to suppress Plaintiffs' revenues from displaying ads on Plaintiffs' websites, to substitute inferior advertisements in place of Plaintiffs' negotiated direct sale placements or other preferred advertising, and to use and misuse information about Plaintiffs' consumers. Plaintiffs are suing to recover their damages caused by Google's illegal conduct.

## II.    PARTIES

11.    Internet Brands is a Delaware limited liability company having its principal place of business at 909 North Pacific Coast Highway, 11th Floor, El Segundo, California 90245.

12.    WebMD Health Corp. is a Delaware corporation having its principal place of business at 283-299 Market Street, 3rd Floor, 2 Gateway Center, Newark, New Jersey 07102.

13.    WebMD LLC is a Delaware limited liability company having its principal place of business at 283-299 Market Street, 3rd Floor, 2 Gateway Center, Newark, New Jersey 07102.

14.    In addition to WebMD, Internet Brands owns and operates, directly and through a variety of affiliates, digital advertising publishers and related businesses, including PulsePoint, a

COMPLAINT                                        4

digital marketing platform that competes with Google. Internet Brands' other affiliates have assigned to Internet Brands their claims against Google and will, together with WebMD Health Corp. and WebMD LLC, be collectively referred to in this complaint as "Internet Brands" or Plaintiffs.

15.     Defendant Google LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in Mountain View, California. Google is, among other things, an online advertising company providing Internet-related products, including various online advertising technologies, directly and through subsidiaries and business units it owns and controls.

16.     Defendant Alphabet Inc. is a publicly traded company incorporated and existing under the laws of the State of Delaware and headquartered in Mountain View, California.  Alphabet was created as a holding company for Google in late 2015, and Alphabet controls Google's day-to-day operations.  Virtually all of Alphabet's revenue comes from Google.  Since December 2019, Alphabet and Google have had the same Chief Executive Officer.  As a result of Alphabet's operational control, Google is Alphabet's alter ego. This Complaint refers to Google and Alphabet together as "Google."

**III.    JURISDICTION, VENUE, AND DIVISION**

17.     This action arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.  The Court has subject-matter jurisdiction under 15 U.S.C. § 4, and 28 U.S.C. §§ 1331 and 1337(a).

18.     In addition to pleading violations of federal antitrust law, Plaintiffs allege violations of state law.  All claims under federal law are based upon a common nucleus of operative facts, and the entire action commenced by this Complaint constitutes a single case that ordinarily would be tried in one judicial proceeding. This Court therefore has jurisdiction over the state-law claims under 28 U.S.C. § 1367(a). Exercising jurisdiction over the state-law claims will avoid unnecessary duplication of actions and furthers the interests of judicial economy, convenience, and fairness.

19.     The Court may exercise personal jurisdiction over Google because Google does extensive business within this District — including by providing the monopolized products in this District to Plaintiffs — and this action arises out of Google's contacts within this District.

COMPLAINT                                             5

20.     Venue is proper in this District under Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

21.     Google's conduct affects interstate trade and commerce.

22.     Google's conduct has direct, substantial, and reasonably foreseeable effects on commerce within the United States, which in turn injures Plaintiffs' foreign and domestic revenue.

23.     Divisional Assignment. Pursuant to Civil L.R. 3-5(b), this action should be assigned to the San Jose Division of this Court, because the Defendants' principal place of business or headquarters may be found within Santa Clara County.

## IV.     BACKGROUND

24.     Plaintiffs' portfolio of websites includes some of the most relevant and visited publications. These publications have unique value to consumers and advertisers. Plaintiffs use advertising technology tools ("ad tech") to sell display ad inventory on their websites.

25.     Plaintiffs have contracts with Google to use Google's publisher ad server, DoubleClick for Publishers, to manage its online display ad inventory. [2]

**A.     Google Leveraged Its Unique Source of Advertiser Demand to Secure Monopolies in Two Ad Tech Markets**

26.     Google controls the buying and selling of open-web display ad inventory across most of the Internet through its participation in three relevant markets: (1) the publisher ad server market, (2) the ad exchange market, and (3) the demand-side platforms market. Google entered the open-web advertising industry with a unique source of advertiser demand from its dominant search advertising business. Google makes access to its unique demand source contingent on the use of its ad tech

---

[2] This Complaint refers to Google's products by their most commonly known names. Google's publisher ad server was long known as "DoubleClick for Publishers" or "DFP" and its ad exchange was known as "AdX". Google has since undertaken a marketing-based combination of these two products into an umbrella product called "Google Ad Manager" or "GAM." This Complaint refers to these separate products as DFP and AdX. Similarly, this Complaint refers to the formerly named AdWords as "Google Ads."

COMPLAINT                                                6

products in other markets. This allowed Google to displace other ad tech and to acquire monopoly power in the publisher ad server and ad exchange market.



Fig. 2. Google participates in (1) the publisher ad server market, (2) the ad exchange market, and (3) the demand-side platforms market.

27.     A demand-side platform is automated ad-buying software that bids to purchase display ad inventory based on advertiser demand and any available targeting information.

28.     Google offers two dominant demand-side platforms: Display & Video 360 ("DV360") and Google Ads.

29.     DV360 is the dominant tool for larger advertisers. Many demand-side platforms for larger advertisers have a minimum spend requirement. For DV360, the minimum spend is $10 million a year. Google typically charges an 8 or 9 percent commission for each winning bid.

30.     Google Ads is the dominant tool for smaller advertisers. Google charges a 15 percent commission on Google Ads.

31.     Google Ads is a "singularly powerful source of digital advertising demand." *Google,* 778 F. Supp. 3d at 826. Google Ads attracts "millions of unique advertisers, including countless small and medium-sized businesses." *Id.*

32.     Google "implemented two policies that incentivized both advertisers and publishers to use AdX" in the ad exchange market. *Id*. at 825. First, Google made AdX the only exchange in

COMPLAINT                                              7

which Google Ads advertising demand was permitted to bid.[3] Second, Google required publishers to use DoubleClick For Publishers if they wanted access to real-time bids from AdX.



Fig. 3. Google only permits Google Ads to bid through AdX and ties AdX to DFP.

33.    Google tied DoubleClick for Publishers to AdX through technical and policy restrictions "that prohibited publishers from receiving real-time bids from AdX (the tying product) unless they also used [DoubleClick for Publishers] (the tied product)." *Id.* 860. Plaintiffs are compelled to use DoubleClick for Publishers because it is the only way to access real-time bids from AdX, and including bids from Google's demand-side platform, Google Ads.

34.    It is not economically or practically feasible to use more than one publisher ad server. Because DoubleClick for Publishers is "the only publisher ad server that could effectively access AdX and, consequently, [Google Ads] demand" it became the only viable economic option for Plaintiffs. *Id.* at 826. For that reason, publishers, including Plaintiffs, view using Google's ad tech products as "essential." *Id.* Google has solidified its illegal tie through a single contractual agreement combining use of both products.

---

[3] Google temporarily allowed an internal program, called AwBid, to allow Google Ads advertisers to purchase from non-AdX exchanges. The ability was mostly limited to retargeting campaigns—ads that follow an internet user around the internet to induce a user to revisit a website— and internally capped as a very small percentage of that advertisers' ad spend.

COMPLAINT                                    8

35. In part because of its exclusive access to Google Ads demand, DoubleClick for Publishers controls over 90% of the market for publisher ad serving worldwide and Google's AdX controls 60% of the ad exchange market worldwide.

**B.     Plaintiffs Must Blindly Rely on Google's Publisher Ad Server to Sell Display Ad Inventory**

36. "[P]ublisher ad servers are mission-critical tools for large publishers," including Plaintiffs, who "couldn't really manage their display advertising revenue without them." *Google*, 778 F. Supp. 3d at 818 (cleaned up). Plaintiffs depend on Google's publisher ad server to monetize ad inventory on their websites. For large publishers like Plaintiffs, there is no longer a realistic alternative to Google by which they can manage their ad inventory. Many features available and preferred by publishers in the preceding decade have been decommissioned on DoubleClick for Publishers with consolidation of the market.

37. DoubleClick for Publishers charges Plaintiffs an amount that varies monthly depending on the volume of impressions served. The more ads served to Plaintiffs, the lower the rate per ad.

38. Publisher ad servers perform at least three essential tasks: (1) identifying the users visiting the publishers' webpages; (2) soliciting bids for the available display ad inventory; and (3) deciding which advertisement is displayed to the reader.

39. First, when a user visits a webpage, the publisher ad server—on behalf of and with the permission from the publisher—identifies the user through identification technology facilitated by the user's web browser (e.g., Chrome or Safari) and/or mobile device (e.g., Android or iOS). To keep track of individual users, the ad server assigns each user a unique user ID.

40. Second, the publisher ad server connects to ad exchanges to solicit bids for specific ad inventory slots, providing the details about the location and size of the available inventory slot on the webpage, as well as the unique user ID. By "tagging" users with a unique user ID, the publisher ad server enables publishers, ad exchanges, and advertisers to identify and track various characteristics and behaviors of each particular user who accesses the publisher's content. This allows a prospective advertiser to assign a unique value to the combination of slot and user.

COMPLAINT                                         9

41.    A third essential function of the publisher ad server is to make the final determination on the ad to be displayed. The publisher ad server generally can choose either a pre-negotiated advertisement, referred to in the industry as a "direct" sale, or the winner of a programmatic auction. This decision can happen before or after the bid is solicited from the ad exchange.



Fig. 4. Google's publisher ad server, DFP, controls both (1) the winner of the programmatic bidding between exchanges and (2) the decision to place a direct or programmatic display ad.

42.    Direct sales are pre-negotiated between publishers and advertisers, including advertising campaigns sold by the publisher's internal sales staff. Among other deal types, direct sales transactions occur in the following ways:

    i.    Insertion order: Publishers and advertisers negotiate contracts specifying the start and end date of a campaign, the number of impressions to be sold, targeting criteria, and other terms. The publisher then creates an "insertion order" and configures the campaign in the ad server. The publisher and advertiser handle billing separately via an invoice. For a direct campaign served via insertion order, the publisher commits to displaying a guaranteed

COMPLAINT                                        10

volume of impressions.

    ii.  Programmatic Guaranteed and Preferred Deals:  As with insertion orders, publishers and advertisers negotiate the terms of an ad campaign directly.  The transaction is then executed through software from ad-tech providers.  Google offers two transaction types for direct sales via its ad-tech software: Programmatic Guaranteed, where price and terms of the inventory is guaranteed, and Preferred Deals, where the advertiser has the option to buy impressions at a reserve price.  Google charges Plaintiffs a 10% revenue share for both types of deals.

    iii.  Private Marketplaces:  Other ad-tech providers besides Google permit Plaintiffs to transact direct sales in a similar manner to Programmatic Guaranteed and Preferred deals.  Ad-tech providers call these "Private Marketplace" deals.

43.    Programmatic sales do not involve any prior negotiation between publisher and advertiser. Instead, publishers auction their ad inventory through ad exchanges in real time.

44.    DoubleClick for Publisher determines whether a direct or programmatic advertisement is placed on Plaintiffs' websites. DoubleClick for Publishers can also choose to reject all bids and place an advertisement for Plaintiffs' own brands, often called a "house ad."

45.    Google does not offer settings that allow for publishers to preference certain deals over other deals and does not allow publishers to have control over the price or content of advertisements sourced from specific ad exchanges. Google does not share information with publishers about how specific advertising bids are chosen.

46.    Google represented to Plaintiffs that it was running a fair, transparent auction. Google provided descriptions of its own internal auction rules, which Plaintiffs relied on to create their strategy to request bids. Google's representations and descriptions were false and misleading as to terms and practices important to publishers. Google's serial deceptions prevented or delayed discovery of its illegal conduct by publishers and the public.

COMPLAINT                               11

**C.     Google's Publisher Ad Server Preferences Google's Ad Exchange, AdX**

47.     DoubleClick for Publisher sends out bid requests to ad exchanges and manages the decision on which ad is placed on Plaintiffs' websites. Instead of using fair auction rules, Google systematically preferred its own ad exchange, AdX, increasing its revenue and consolidating its monopoly power in the ad exchange market.

48.     Ad exchanges are real-time auction marketplaces that receive requests for bids from publisher ad servers, recruit bids from various ad buying tools, and submit the winning bid back to the publisher ad server.



Fig. 5. AdX requests bids from a variety of demand-side platforms.

49.     The ad exchange requests participating demand-side platforms to place bids on behalf of their advertisers. To determine those bids, demand-side platforms may run an internal auction among participating advertisers prior to submitting a bid to the exchange auction.

50.     Each ad exchange collects the available bids, picks a winner, and submits that winning bid back to the publisher ad server. While exchanges return bids for individual impressions, bids are typically priced in terms of its "Cost-Per-Mille" ("CPM"), or the price for one thousand impressions.

COMPLAINT                                    12

For example, when an exchange wants to bid $0.01 for an individual impression, the bid is communicated to the ad server as $10 CPM.

51.     Ad Exchanges receive revenue from publishers when the publisher ad server chooses that exchange's winning bid. The charge to the publisher is a percentage (called a "revenue share" or "take rate") of each impression's sale price. To account for that revenue share, exchanges submit bids to the ad server on a "net" basis, *i.e.*, the winning bid minus the ad exchange's revenue share.

52.     Google has rigged DoubleClick for Publishers so that its own ad exchange, AdX, wins bids even when it does not offer the highest bid and is not the preferred ad to be displayed by Plaintiffs.

**D.     Google's Manipulation of Real-Time Bidding Depresses Plaintiffs' Revenue**

53.     Google uses its control of DoubleClick for Publishers "to implement additional policies that benefited its ad tech products" at publishers' expense and in violation of Google's own terms and conditions. *Google*, 778 F. Supp. 3d at 826.

54.     Plaintiffs' terms and conditions with Google hold that:

Google will not:

a. use data entered by Company into the Google Ad Manager user interface ("Company Entered Data") that is not generally shared with buyers for purposes of informing bids made on behalf of Google's Ads service or the DoubleClick Bid Manager service (or successor services to the foregoing), unless Company expressly authorizes such use via the Google Ad Manager user interface or otherwise in writing; or

b. use Company Entered Data that is not generally shared with buyers to inform pricing or offers on YouTube or other Google owned and operated sites; or

c. use Data (including any Company Entered Data) to create a segment of users whose sole criterion for creation is that such users are End Users of the Target Properties for the purpose of targeting advertising to such segment of Target Property End Users, unless on Company's behalf and for Company's sole use or if Company expressly consents to such use via the Google Ad Manager user interface or otherwise in writing.

COMPLAINT                                    13

55.     Google's policies and auction manipulations secretly violated Google's terms and conditions with publishers and directly contradicted the representations that Google made to Plaintiffs to induce them to use its publisher ad server. Google did not provide notice that it was using Plaintiffs' data and did not compensate Plaintiffs for the use of Plaintiffs' data.

56.     Google used its secret policies and auction manipulations to deprive publishers of revenues, depress market prices, deprive publishers of control over their ad inventory, and to use and misuse Plaintiffs' information provided to Google through DoubleClick for Publishers. Google falsely represented that it was running fair and transparent auctions, and Google did not provide Plaintiffs with the data or information that they would need independently to detect these auction manipulations.

57.     The following are prominent auction manipulations and secret policies that Google implemented among other deceptive and harmful practices.

### 1.     Dynamic Allocation / First Look (2010)

58.     Google implemented a feature called Dynamic Allocation in DoubleClick for Publishers. Dynamic Allocation was advertised to publishers as a way to increase yield on its non-guaranteed programmatic ad inventory sales. Prior to Dynamic Allocation, advertisers, through ad exchanges, made bids at a fixed cost-per-mille. Publisher ad servers would contact each ad exchange until an acceptable price was provided, and then the ad server would accept that price and serve the selected ad impression to the user.

59.     Google permitted certain demand-side platforms, through AdX, to submit real-time bids in response to each individual ad impression offered. Google advertised that its "research demonstrated that the combined effects of auction pressure and Dynamic Allocation in DoubleClick Ad Exchange resulted in an average CPM life of 136%."[4]

60.     As part of this newly implemented auction process, Google allowed AdX, and only AdX, to review the currently winning bid on the publisher ad server. Google did not permit its

---

[4] Google Whitepaper, Profiting from non-Guaranteed Advertising: The Value of Dynamic Allocation & Auction Pricing for Online Publishers, 2010.

COMPLAINT                                        14

publisher ad server to accept real-time bids from any other ad exchange instead of or in addition to AdX, and Google did not allow publishers to alter Dynamic Allocation in ways that benefited competition. This component of Dynamic Allocation is referred to as "First Look" in Judge Brinkema's liability opinion in the Government action.

61. First Look required Plaintiffs "to offer AdX a first right of refusal for each impression." *Id.*

62. Plaintiffs "had to give AdX the opportunity to buy the publisher's impression before any rival [ad] exchanges were permitted to bid for that impression." *Id.* While AdX could bid in real-time, other exchanges "were required to make static bids that were set in advance and could not account for contemporaneous information about the value of the specific impression." *Id.*

63. As a result of First Look, AdX won auctions "even when advertisers using rival ad exchanges were willing to pay a higher price for the impression." *Id.* This resulted in publishers, including Plaintiffs, "not obtaining the maximum value for their impressions." *Id.* at 827.

64. The "unfair advantage" of First Look "was built into the software that controlled the auction logic" within DoubleClick for Publishers, and Plaintiffs could not turn it off. *Id.*

65. First Look entrenched Google's monopoly power in the ad exchange market. Other ad exchanges could not "enter the market, grow, and compete" with AdX because AdX could win the auction without offering the highest bid. *Id.*

66. In its First Look program, Google used data that was not shared with buyers to inform bids made on its own behalf. Google also used First Look to give itself "a data advantage" by using the data to train its auction bidding models to bid more effectively. *Id.*

67. Google told publishers that First Look was a "risk-free way to get the  highest real-time revenues for all their non-guaranteed impressions." This was false, and Google knew it to be false when it made this representation.

68. First Look depressed Plaintiffs' revenue and Google knew that First Look depressed Plaintiffs' revenue. In its own internal analyses, Google found that publishers' clearing prices increased by an average of 40% when ad exchanges competed directly.  It nevertheless required

COMPLAINT                                                      15

publishers to use First Look as part of Dynamic Allocation, without allowing publishers to reassign or alter Dynamic Allocation.

### 2.    Project Bernanke (2013)

69.    Google also manipulated the open-web display ad tech auctions through "Project Bernanke," also referred within Google to as "Project Alchemist," "Global Bernanke," and "Bell v.2," Google's Project Bernanke auction manipulations enriched Google and entrenched its ad exchange market power. Google's internal analyses estimated that Project Bernanke could depress a publisher's revenue upwards of 40%.

70.    Using this program, Google abused its access to bid information and publisher strategies in DoubleClick for Publisher. Prior to Project Bernanke, Google sent the two highest bids from Google Ads as they had been submitted to AdX. For example, if the two highest bids on Google Ads were $8.00 and $4.00, those numbers were submitted to DoubleClick for Publisher through AdX. With Project Bernanke, Google abused its access to the winning bids from other ad sources in DoubleClick for Publishers and used that information to change the bids submitted from Google Ads to AdX to either undercharge publishers or unfairly win the auction without providing publishers with any additional revenue.

71.    For many years, DoubleClick for Publishers operated a second price auction. This meant that there were two bids submitted: the highest bid and the second highest bid. The winner would be the highest bidder, but that advertiser would only have to pay the price of the second-highest bid plus one penny. In the example above, if Google Ads won the auction, the winning advertiser would be the one who bid $8.00, but it would only be charged $4.01 by Google Ads.

72.    Under Project Bernanke, DoubleClick for Publishers would inform Google of the currently winning bid from other ad bidding sources. When there was no competition for the ad impression, Google would increase the price of its first bid (to guarantee that advertiser won the auction) and depress the price of its second bid (so that the price paid by the winner would be rock-bottom). In the same example, Google Ads might manipulate its auction mechanics to submit a $15.00 bid and a $1.00 bid to AdX (with no input from the advertisers on the change of price). AdX would pass on the "winning bid" to DoubleClick for Publishers at the $1.01 price, which, minus AdX's 20%

take-rate fee, made for a total winning bid of $.81. However, Google Ads still charged its advertisers as if it had submitted accurate, non-manipulated bids – *i.e.*, Google Ads still represented to the $8.00 bidding advertiser that it won the ad impression for $4.01.

73. Google diverted the difference between the charge to advertisers and the payment publishers into a separate slush fund. Google used those funds to manipulate bids submitted in competitive auctions (and auctions that Google Ads would have otherwise lost without the slush fund contribution), in order to gain market share and strategically beat out rival exchanges. When Google rigged its bids to beat third-party exchanges, publishers made no more money, due to Google's manipulations to the algorithm to win the auction over rivals by a single penny.

74. When DoubleClick for Publishers moved to operating a first price auction, Google continued to manipulate auction prices, unfairly using its knowledge of other winning bids and publisher strategies to underpay publishers, divert the ill-gotten proceeds into slush fund, and then using the funds to entrench its monopoly and beat out rival exchanges.

75. Google did not inform publishers that it was using DoubleClick for Publishers information to rig the bidding in Google Ads and AdX. Instead, Google represented that it was running fair and regular auctions and only comparing bids after the AdX auction was completed.[5]

76. Using the described secret policies and auction manipulations, Google abused and entrenched its market power and suppressed Plaintiffs' revenue.

### 3.    Last Look (2014)

77. In response to Google's growing dominance in the ad exchange market, "non-Google industry members and open-source advocates" developed a way for publishers "to solicit real-time bids from multiple ad exchanges" instead of only AdX. *Google*, 778 F. Supp. 3d at 828. Known as

---

[5] *See, e.g.,* Jason Bigler, An update on first price auctions for Google Ad Manager (May 10, 2019) https://blog.google/products/admanager/update-first-price-auctions-google-ad-manager/ (claiming that "Currently . . . [a] second price, real-time bidding auction run with Authorized Buyers — which includes Google Ads, Display & Video 360 and other Demand Side Platforms — [is] *followed by* a first price auction that compares the winning price from the second price auction with a publisher's guaranteed and non-guaranteed advertising campaigns, as well as bids from Exchange Bidding buyers.") (emphasis added).

header bidding, participating publishers, including Plaintiffs, inserted "a string of code into the header of its webpage to solicit bids from multiple ad exchanges and hold fair auctions for the publisher's inventory" outside of DoubleClick for Publishers. *Id.*

78.    After there was a winner of the real-time header bidding, it was placed as the floor price in DoubleClick for Publishers. Because AdX was forced to compete against other real-time bids from other ad exchanges, header bidding "dramatically increase[d] publisher revenue." *Id.* Google's internal documents similarly recognized that "pitting multiple exchanges against one another fostered price competition, which was good for [publishers'] business."

79.    In response, Google manipulated its algorithm to take advantage of the new dynamic price floor to continue preferencing its own ad exchange and entrench its market power by depriving rivals of volume and revenue. Because the header bidding real-time auction happened prior to DoubleClick for Publishers' auction, Google was able to "avoid direct head-to-head competition between AdX and other exchanges." *Google,* 778 F. Supp. 3d at 828.

80.    "Being able to view its competitors' bids provided Google and its advertising customers with a significant informational advantage that significantly disadvantaged other competitors in the ad exchange space." *Id.* at 829 (internal citations and quotations omitted). Because Google could see the winning bid from the first auction, it could adjust its submissions and "just bid 1 cent more, which "harmed publishers" by reducing their revenue in comparison to a situation in which AdX had to bid without knowledge of competing bids." *Id.* (cleaned up.) Because the bids are priced on a per-one-thousand basis (cost-per-mille, or CPM) impressions with a bid of 'one cent more' is an actual price of $0.00001 more.

81.    Last Look harmed Plaintiffs because they "were not compensated as much as they would have been for their inventory had Google's AdX demand been required to compete with third-party exchanges (*i.e.*, non-Google exchanges) on a level playing field." *Id.* Google lied about whether Open Bidding or Exchange Bidding was subject to Last Look.

### 4.    Enhanced Dynamic Allocation (2014)

82.    In 2014, Google introduced Enhanced Dynamic Allocation. This algorithm update allowed AdX to co-opt premium ad inventory already purchased and reserved for direct sales. Google

COMPLAINT                                          18

manipulated its DoubleClick for Publisher algorithm to allow AdX to bid lower than the negotiated price on select direct sale inventory, plucking the best impressions for its own ad exchange at lower-than-market prices.

83.    Prior to Enhanced Dynamic Allocation, the publisher ad server prioritized direct sales over programmatic bidding. If an impression was available that fit the direct sale criteria, it was given first preference, and the slot was filled with the direct sale ad impression.

84.    Under Enhanced Dynamic Allocation, Google assigned a direct sale a cost-per-mille price to integrate it into the programmatic sale component of the publisher ad server. This price was not necessarily the price negotiated between the publisher and the advertiser, instead, this was a "dynamic" price that differed for each available impression based on Google's determination of that impression's value. AdX was then given an opportunity to outbid this newly assigned price. If AdX was able to provide a bid above the newly assigned direct sale price, DoubleClick for Publishers' final auction logic would pick AdX's bid to fill the impression.

85.    Google did not fairly or objectively assign a cost-per-mille price to the direct sale inventory. Instead, Google manipulated the cost-per-mille price of direct sale inventory so that AdX could win auctions on specific impressions that Google determined were valuable.

86.    The Government provided the below visual description of Enhanced Dynamic Allocation in its closing remedies argument in front of Judge Brinkema in the case of *United States v. Google*, 23-cv-00108 (E.D. Va.).

COMPLAINT                                                    19



Fig. 6. DoubleClick for Publisher's Final Auction Logic used Enhanced Dynamic Allocation to lower the price of direct sale bids, allowing AdX to take valuable ad inventory at suppressed prices.

87.    Enhanced Dynamic Allocation enriched Google, harmed competition, and injured Plaintiffs.

88.    Google increased its AdX revenue and win rate. AdX revenue increased because Google transacted more impressions, and those new impressions were higher value and expensive. Because AdX takes a 20% cut from the win rate, these factors directly increased AdX's revenue. Google increased its win rate through its exclusive access to valuable ad inventory previously reserved for direct sales offered to AdX at artificially lowered prices.

89.    Enhanced Dynamic Allocation's exclusive offers of valuable inventory to AdX also entrenched AdX's monopoly in the ad exchange market.

90.    The availability of high-quality impressions on AdX, and only on AdX, decreased Plaintiffs' revenue, both immediately and on a long-term basis. Inventory sold on AdX, with a 20% take rate, at lower prices than the same inventory would have been sold through the existing direct sales lowered Plaintiffs' revenue immediately. It also depressed revenue on a long-term basis. Without Enhanced Dynamic Allocation, advertisers need to purchase high-value impressions in bulk,

COMPLAINT                                    20

making it an expensive and time-consuming task. These barriers made high-value impressions available to only a certain set of advertisers with the scale and financial resources to make these commitments.

91. Enhanced Dynamic Allocation undermined the traditional model in at least two ways. First, under Enhanced Dynamic Allocation, advertisers on AdX could purchase advertisements one at a time, giving them a disincentive to make bulk purchases. Second, AdX was given the right of first refusal. As a result, even if an advertiser and publisher made a direct sale, Google could usurp the opportunity.

92. Enhanced Dynamic Allocation took further control of what was displayed on Plaintiffs' websites away from Plaintiffs.

93. Google Ads, which hosts smaller advertisers and is exclusively offered through AdX, is an essential component of the advertiser demand for open-web display ad inventory. However, Enhanced Dynamic Allocation forced Plaintiffs to offer its inventory to unvetted and unknown smaller advertisers through Google Ads at discount prices. As a result, Plaintiffs lost further control of the quality and content of the advertisements being displayed on their websites.

94. Google touted Enhanced Dynamic Allocation as a way for publishers to increase yield. When publishers requested that Google provide additional data about Enhanced Dynamic Allocation, Google declined to do so. Google knew its claims about Enhanced Dynamic Allocation helping publishers were false. Instead, Enhanced Dynamic Allocation increased Google's profits and decreased publishers' revenue.

### 5. Sell-side Dynamic Revenue Share (2014)

95. Google entrenched AdX as the winning bidder using "sell-side dynamic revenue share." Google contractually agrees in its GAM agreement with Plaintiffs to take 20% of a winning bid as its revenue share.

96. Google instead manipulated its algorithm to maintain an "overall take rate of around 20." *Google*, 778 F. Supp. 3d at 829. As a result, Google "would lower its take rate below 20% on competitive impressions that had received relatively high offers," and "compensate for such

COMPLAINT                                      21

temporary losses in revenue by charging a take rate above 20% for impressions where its advertisers faced less competition." *Id.*

97.    Sell-side dynamic revenue share "helped AdX advertisers win more auctions," and caused other forms of advertising, such as a header bidding and direct sales, to win fewer auctions. *Id.*

98.    Sell-side dynamic revenue share harmed competition, entrenched AdX's market power, and depressed Plaintiffs' revenue. Sell-side dynamic revenue share deprived rival exchanges of much of the benefit from charging lower fees, thereby dampening price competition on the take rate or price of ad exchange services. Without sell-side dynamic revenue share, there would have been more competition among exchanges to differentiate the services or terms for publishers, particularly publishers like Plaintiffs who sold advertising inventory at high prices.

99.    Google lied to publishers about sell-side dynamic revenue share. Google claimed to publishers that disabling sell-side dynamic revenue share would "reduce Ad Exchange yield," when Google knew that the program did not increase publishers' yield.

100.    As part of Google's sell-side dynamic revenue share program, Google also altered the price floor in publishers' auctions. Google never told publishers that sell-side dynamic revenue share manipulated publisher-set price floors.

101.    Google does not provide publishers with bid-level data in DoubleClick for Publishers that would enable publishers to determine that sell-side dynamic revenue share was manipulating publisher price floors and overall decreasing publisher yield.

### 6.    Project Poirot (2018)

102.    Google introduced Project Poirot to manipulate its demand-side platform algorithm, which also harmed competition, entrenched AdX's market power, and depressed Plaintiffs' revenue.

103.    Project Poirot intercepted bids that DV360, Google's demand-side platform for larger advertisers, sent to third-party exchanges and substituted lower bids instead. Google called these bids "shaded." *Google*, 778 F. Supp. 3d at 830. "Publishers more frequently rejected these shaded bids from non-AdX exchanges, which offered them less revenue, and increasingly accepted bids from AdX." *Id.* This became a self-reinforcing cycle: as non-AdX exchanges became less profitable for

COMPLAINT                                                   22

advertisers and publishers, DV360 advertisers "dedicat[ed] an even higher proportion of their advertising spending to AdX." *Id.*

104. Project Poirot had an immediate negative effect on competition in the ad exchange market. AdX's competitors saw up to a 40% decrease in revenue from DV360, which "damaged the company" and inhibited their ability to compete with Google. *Id.* Project Poirot shifted transactions away from independent exchanges that otherwise would have had the incentive and ability to offer terms and features that serve the interest of premium publishers. Because of the importance of publishers with high-quality content, such as Plaintiffs, those exchanges would have advanced their interest to build their own business had Google not prevented them from doing so.

### 7. Unified Pricing Rules & Minimum Bid to Win (2019)

105. In 2019, Google responded to internal and external pressure to improve the transparency and fairness of its advertising auction process, and "agreed to removed Last Look." *Google*, 778 F. Supp. 3d at 830. Google simultaneously introduced "Unified Pricing Rules." *Id.* Under the Unified Pricing Rules, Google prohibited Plaintiffs from "setting higher price floors for [Google Ads] demand than for demand from other ad networks or demand-side platforms."

106. Google alleged that these policy changes "would make auctions safer and simpler." *Id.* at 830-31. This was false, and Google knew it was false. Publishers, including Plaintiffs, often set higher pricing floors for AdX as one of the few ways in which they could have some control over the advertising content displayed on their websites. Setting higher price floors on AdX helped publishers "screen out low-quality ads, which were more likely to originate from smaller advertisers" using Google Ads. *Id.* at 831. Google also knew that publishers "set[] higher pricing floors for AdX than for other exchanges so they could reduce their high dependence on Google's ad tech." *Id.*

107. The implementation of Unified Pricing Rules reduced Plaintiffs' "ability to control ad pricing, maintain ad quality, and diversify their source of revenue." *Id.*

108. As part of the Unified Pricing Rules, Google created a similar program to Last Look that it calls "Minimum Bid to Win."

109. After an auction concludes, DoubleClick for Publishers tells authorized demand-side platforms what the minimum price to win the impression would have been. This is not the price at

which the impression sold; instead, Google tells the winning bidder the cheapest price at which the winner could have bid to win the impression.  Minimum Bid to Win thus provides functionally the same information as Last Look, only immediately after the auction instead of beforehand.

110.    Google then developed a bidding algorithm that used the Minimum Bid to Win from prior auctions to depress prices in bids in future, similar auctions. Google's Unified Pricing Rules and Minimum Bid to Win changes to DoubleClick for Publishers "increased the number of impressions AdX won and the revenue it received, while decreasing impressions won and revenue received by third-party exchanges." *Id.* at 831. It also decreased Plaintiffs' revenue on a per impression basis.

## V.    RELEVANT MARKETS

111.    The "relevant market" consists of the relevant product market and the relevant geographic market.

### A.    Publisher Ad Servers for Open-Web Display Inventory is a Relevant Antitrust Market

112.    "[P]ublisher ad servers for open-web display advertising constitutes a distinct relevant product market." *Google*, 778 F. Supp. 3d at 833-34.

113.    Publisher ad servers enable publishers to manage and monetize their web ad inventory. *Id.* Publisher ad servers cannot be reasonably interchanged with other products because they have distinct purposes from, and offer different features than, other ad tech products. Publisher ad servers' unique features include "allocating ad inventory between direct sales and programmatic sales; placing ad exchange bids in competition with bids from header bidding, programmatic direct sales, and other ad exchanges; rendering an advertisement on the publisher's webpage for each impression; billing for ads rendered; and providing inventory and revenue analytics." *Id.*

114.    Ad networks, which service smaller publishers, have fewer features and are not substitutes for publisher ad servers. For example, a publisher using an ad network cannot display ads sold by the publisher through direct sales. And "an ad network cannot place a variety of advertising demand sources in competition with each other for each impression." *Id.* at 837. Instead, ad networks are "limited to sourcing bids from advertisers who have signed up for the network." *Id.*

COMPLAINT                                          24

115. Publisher ad servers are recognized as a distinct product in the ad tech industry. Google recognizes that the market for ad servers is distinct from markets for other ad-tech products and calculates its share of the publisher ad-server market separately from other ad tech products. At the time that the FTC reviewed and approved Google's acquisition of DoubleClick for Publishers, several publisher ad-servers existed, including AppNexus. Some of those competing publisher ad-servers were considered to offer features superior to those offered by DoubleClick.

116. Google also publicly recognizes that publisher ad servers form a distinct market. When Google acquired DoubleClick and its leading ad server, Google represented to the FTC that an ad server was "not [a] direct substitute[]" for an ad network, calling any assertion to the contrary "seriously flawed and utterly divorced from commercial reality." According to Google, an increase in the price for DoubleClick's ad server would cause publishers to "switch to other publisher-side ad serving products."

117. Publishers cannot develop their own technology as a reasonable substitute to using a commercial publisher ad server. "Building an in-house ad server is 'incredibly sophisticated and incredibly complex,' and is not within the 'core competencies" of most organizations that publish news or other content online." *Google*, 778 F. Supp. at 836 (quoting trial testimony of Tim Wolfe, Senior Vice President and Revenue Operations at Gannett). Doing so would require "major investment," and the maintenance of an in-house publisher ad server would require "significant operational support, infrastructure, and capital resources." *Id.* at 836-37 (cleaned up). As a result, only very few publishers—almost all of which are large digital technology companies—have developed their own ad tech, including their own ad tech server. *Id.* at 837 (listing Amazon, Google, Meta, Reddit, Snapchat and TikTok).

**B.    Ad Exchanges for Open-Web Display Inventory is a Relevant Antitrust Market**

118. "[A]d exchanges for open-web display advertising constitute a distinct relevant product market." *Google*, 778 F. Supp. 3d 797 at 837.

119. Ad exchanges have unique functionality. They are the "only ad tech tool through which publishers can auction their ad inventory at scale and in real-time to the largest sources of programmatic advertising demand," including DV360, The Trade Desk, or Google Ads. *Id.* at 838.

COMPLAINT                                                      25

Ad exchanges allow a variety of demand-side platforms to make bids on ad inventory, rank the returning bids, and select the winning bid to be sent to the publisher ad server.

120.    Ad exchanges are recognized in the ad tech industry as a separate market. Ad networks cannot reasonably substitute for an ad exchange because ad networks "offer very limited control and are unable to place bids from disparate demand sources in competition with each other." *Id.*

121.    Ad exchanges also are not interchangeable with the direct sales channel.  Buying and selling ad inventory directly is costly; a publisher must employ a dedicated sales staff to manage, sell, and serve online ad campaigns.  It would be infeasible for Plaintiffs to scale up direct sales to substitute for programmatic sales.

122.    Additionally, cost aside, it remains commercially infeasible for publishers like Plaintiffs to sell advertising inventory only through direct sales.  Plaintiffs' supply of impressions can expand or contract depending on traffic—it would be difficult to pre-negotiate the sale of a moving target.  Advertisers negotiating direct sales also do not want to appear alongside certain types of content that, while important, are not well suited for certain advertising campaigns.  And advertisers ultimately prefer the flexibility of programmatic sales for a portion of their advertising spend.

123.    Google itself analyzes the ad exchange market without reference to ad servers, ad networks, DSPs, or direct sales.  Specifically, Google measures AdX's market share by tracking its percentage of overall exchange market revenue and exchange impression volume, *i.e.*, how many impressions AdX intermediates as compared with other exchanges.  Meanwhile, Google describes direct sales and ad networks as separate channels with "distinct characteristics."

**C.    Worldwide is a Relevant Geographic Market.**

124.    The relevant geographic market is worldwide.[6]

125.    "The globally networked nature of the Internet has resulted in worldwide competition among ad tech providers, with the speed of light serving as a primary impediment to intercontinental

---

[6] Plaintiffs' definition follows the definition proposed by Dr. Lee and adopted by the Court in *United States v. Google*, 778 F. Supp. 3d 797, 848 (E.D. Va. 2025), and excludes certain countries where the operation of online markets is substantially restricted by government censorship of the Internet or U.S. economic sanctions. As such, Plaintiffs' definition excludes China, Cuba, Iran, North Korea, Syria, Russia, Crimea, Donetsk and Luhansk.

COMPLAINT                                                    26

ad serving." *Google*, 778 F. Supp. 3d at 848. Ad tech providers have built global infrastructure and "often manage, price, sell and track performance of their products globally." *Id.*

126.    Ad tech providers "often view themselves as competing globally." *Id.* Publisher ad servers and ad exchanges are marketed globally, and do not face substantially different regulatory requirements across countries within the defined worldwide market. *Id.* For example, Google charges the same ad exchange fees worldwide and often implements product and policy changes on a worldwide basis. *Id.* In the alternative, the geographic market is no smaller than North America or the United States.

**D.    Google's Monopoly Power in the Publisher Ad Server Market**

127.    Google has monopoly in the worldwide publisher ad server market. *Google*, 778 F. Supp. 3d at 850.

128.    Google's publisher ad server, DoubleClick for Publisher, is the dominant market player in the world publisher ad server market. Various market share estimates put Google's share between 84% and 93.5% over the past decade. Google refers to its own market share as "the defacto, [*sic*] preferred ad server of choice for 90% of publishers." *Id.* Industry participants refer to Google as having a monopoly in the publisher ad server market.

129.    All major competitors to DoubleClick for Publisher have exited the market. Meta, the parent company of Facebook, Instagram, and WhatsApp, among other apps, and a market leader in other forms of digital advertising, initiated a project to build a publisher ad server but "shut down its project . . . due to the significant barriers to gaining scale in a market dominated by Google." *Id.* at 851.

130.    There are significant barriers to entry in the publisher ad server market.

131.    The most significant barrier to entry or expansion has been Google's illegal conduct because it diverted demand, supply and transactions and imposed costs on independent exchanges and other ad tech even when other ad tech tools offered publishers superior service, performance and features as compared to Google's ad tech.

132.    The development and maintenance of a publisher ad server require significant capital investment and implementation of highly complex technology.

COMPLAINT                                           27

133.    For publisher ad server customers, there are extremely high switching costs. Publishers generally only use a single ad server. As stated by a former Google executive, "switching publisher ad servers '[t]akes an act of God to do' and is a 'nightmare' because '[n]othing has such high switching costs.'" *Id*. A publishing executive similarly described switching publisher ad servers as "a year-long process that was 'akin to … changing the tires on the race car mid race.'" *Id.*

134.    There is also direct evidence of Google's monopoly in the publisher ad server market. Google has intentionally degraded the quality of its publisher ad server for strategic reasons knowing that it harms publishers, without suffering a coordinate loss of market share as a result of that deprecated service. For example, Google has impaired publishers' ability to compare between ad exchanges and limited publishers' ability to set price floors for their inventory. Google made changes to its publisher ad server without concern about publishers' switching away from DoubleClick for Publishers, and publishers have not switched. In 2022, Google had a market share of 91%. *Id.* at 850.

**E.    Google's Monopoly Power in the Ad Exchange Market**

135.    Google has monopoly power in the worldwide ad exchange market. *Google*, 778 F. Supp. 3d at 852.

136.    Market share estimates put the market share of AdX, Google's ad exchange, between 54% and 71% of the worldwide ad exchange market based on the volume of transactions processed. Google's share is "roughly nine times larger than the share held by Google's next-largest competitor, which had only 6% of the market." *Id.* at 855. Industry participants consider AdX to have a dominant position in the market. *Id.*

137.    There are significant barriers to entry in the ad exchange market.

138.    As with the publisher ad server market, Google's conduct is the most significant barrier to entry. For example, Trade Desk, a niche demand-side platform, and other competitors could have expanded rapidly had Google ceased its exclusionary conduct and fraudulent auction manipulations.

139.    Building and hosting an ad exchange requires large capital expenditures and the implementation of complex technology. Additionally, "[s]cale and network effects are crucial for ad exchanges," because the purpose of an ad exchange is to match ad inventory from a publisher ad

COMPLAINT                                                28

server to a willing demand-side platform bidder. *Id.* at 856. The more customers on each side, the higher the quality of the match between the platforms. More customers also allow the exchange opportunities to improve its product, providing "auction and targeting data," "train machine learning algorithms," and "improve publisher-advertiser matching." *Id.*

140. There is also direct evidence of Google's monopoly power in the ad exchange market. Google charges a 20% take rate for each impression sold; ad exchange competitors charge closer to 10%. Google has sustained this margin for over a decade, even when "margins were coming down, way down, because the technology, demand and supply that ad exchanges offer had been commoditized to a large extent." *Id.* at 853 (quoting a Google product director) (cleaned up). Google's internal analyses determined that AdX's "elasticity or expected elasticity is one or less," which indicates that publishers would be unlikely to switch away from AdX due to a price increase. *Id.* at 839.

## VI.    ANTICOMPETITVE CONDUCT

141. As noted above, Google is a monopolist in the publisher ad server and ad exchange markets, and Google illegally tied access to its ad exchange product, AdX, to its publisher ad server product, DoubleClick for Publisher.

142. Google aggressively uses and abuses its market power and illegal tie to extract illegal profits and supracompetitive fees from these markets. Google then uses these funds to fraudulently and continuously foreclose rivals and protect its monopolies.

143. Google leveraged its unique source of advertising demand, Google Ads, to monopolize the ad exchange and publisher ad server market. Google Ads is the sole demand-side platform for millions of smaller advertisers. Google functionally limits access of Google Ads to AdX and DoubleClick for Publishers. Because Google Ads provides a unique and essential component of advertising demand, publishers were forced to use DoubleClick for Publishers to access AdX and Google Ads. Today, over 90% of the publisher ad server market uses DoubleClick for Publishers.

144. Google capitalized on publishers' usage of DoubleClick for Publishers to entrench its market power and foreclose rivals in the ad exchange market. Google lied to publishers about its policies and auction mechanics, and Google provided little to no data about the auction results.

Unknown to publishers, the ad tech industry generally, or the public, Google implemented a series of secret policies and auction manipulations to unfairly compete in the ad exchange market, grow its market power, and foreclose rivals.

145. Google's secret policies and auction manipulations preference AdX to the detriment of competition.

146. Google's strategic and evolving use of secret policies and auction manipulations over many years has denied competitors access to market share they would have otherwise won at auction and deprived them of the scale that would have allowed them to increase the quality of their product. As a result, AdX dominates the ad exchange market, with an estimated 60% market share, nine times higher than the next largest ad exchange.

147. Google blocked publishers from using their own first-party data to induce bidding from independent exchanges and other demand sources.

148. At the same time, Google used that same data to benefit its own advertising businesses and coordinate with a primary potential competitor, Facebook, to reduce overall competition. Google helped Facebook identify open-web users to benefit Facebook's in-app advertising efforts. This induced Facebook to stop supporting open-web header bidding or competing with Google.

149. At the same time, Google blocked publishers from using their own data in a similar manner to help others in the ad tech industry, including Trade Desk and Prebid, to expand their business and to become more capable and effective competitors to Google ad tech.

150. Having secured its illegal monopolies, Google has used that market power to enrich itself by further harming competition. Because Google is the only economically feasible option for Plaintiffs—Plaintiffs have no choice but to accept Google's inferior service and products.

## VII.    ANTICOMPETITIVE EFFECTS

151. During all times relevant to Plaintiffs' claims, Google has willfully monopolized and illegally maintained monopolies in the publisher ad server and ad exchange markets, through its illegal tie and the secret policies and auction manipulations described above, that have separately and collectively harmed competition by:

COMPLAINT                                     30

a. Increasing barriers to entry and excluding competition (including from Plaintiff's PulsePoint services) from both existing and nascent competitors in the publisher ad server and ad exchange markets;

b. Excluding rivals from effectively competing for Plaintiffs' and other publishers' business, including (1) excluding all competitors from accessing valuable real-time bids from AdX and (2) using Google's increasing control of Plaintiffs' final display advertising decision-making to implement illegal, secret policies and auction manipulations to secure AdX advertising over other advertising display opportunities.

c. Stunting innovation of new products and services that could provide competitive auction prices; and

d. Charging supracompetitive prices to Plaintiffs and other publishers for Google's ad server and ad exchange products and services.

152. Google's foreclosure of competition in the publisher ad server and ad exchange markets has harmed publishers, including Plaintiffs. By suppressing competition in these markets, Google has exercised and exercises more power to manipulate ad inventory and auction dynamics in ways that suppress publishers' revenue from open-web display advertising, substitutes inferior advertisements in place of Plaintiffs' negotiated direct sale placements or other preferred, non-Google Ads advertising, erodes the trust and goodwill of both other advertisers, and misappropriates Plaintiffs' valuable data and proprietary information.

153. Absent Google's exclusionary conduct: (a) dynamic competition in the publisher ad server and ad exchange markets would lead to higher quality advertising; (b) dynamic competition in the publisher ad server and ad exchange markets would allow publishers, including Plaintiffs, to pay less for publisher ad server and ad exchange products and services and on more favorable terms, with better quality and service from Google or a competitive rival; and (c) the incentives and ability for companies to innovate and develop innovative ad exchange and publisher ad server products and services would be restored, resulting in more options, better products and services, and higher consumer welfare.

COMPLAINT                                    31

154.    The anticompetitive effects directly flowing from Google's anticompetitive conduct, including its illegal tie, its secret policies, and its auction manipulations, have allowed Google to develop and maintain monopolies in the markets for ad exchange and publisher ad servers. These anticompetitive effects outweigh the benefits, if any, from the product tying and auction manipulations, or those benefits could be accomplished by less restrictive means.

## VIII.    TOLLING

155.    Plaintiffs assert claims arising from all open-web display advertising sold within the applicable statute of limitations period.

156.    The United States Department of Justice's action, filed on January 24, 2023, suspended the running of the statute of limitations against Google during the pendency of the Department of Justice's case and for one year thereafter. 15 U.S.C. § 16(i).

157.    The putative class action, filed on August 12, 2021, suspended the running of the statute of limitations against Google for federal claims for all asserted class members, including Plaintiffs. *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345 (1983) (citing *Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538, 539 (1974).

158.    The applicable statute of limitations was further tolled by Google's affirmative and fraudulent concealment of its anticompetitive conduct.

159.    Google publicly represented that it was running fair, transparent auctions on AdX and on DoubleClick for Publisher. For example, Google claimed that "[a]ll participants in the unified auction, including Authorized Buyers and third-party yield partners, compete equally for each impression on a net basis." This is false, and Google knows that it is false.

160.    Google represented how its programs worked through its descriptions of its internal auction rules and its GAM Agreements with Plaintiffs. Plaintiffs relied on Google's descriptions and representations to decide their strategy for open-web display advertising. Google has never withdrawn or corrected its descriptions of its internal auction rules.

161.    Google misrepresents and obfuscates how its internal auction mechanics work to Plaintiffs to this day.

COMPLAINT                                    32

## IX.    VIOLATIONS ALLEGED

*First Claim for Relief:*

*Monopolization and Maintaining Monopoly of Publisher Ad Servers for*

*Open-Web Display Inventory in Violation of The Sherman Act § 2*

162.    Plaintiffs incorporate the allegations of paragraphs 1 through 161 above.

163.    Publisher ad servers for open-web display inventory is a relevant antitrust market, and Google has monopoly power in that market.

164.    Google has unlawfully monopolized and now willfully maintains its monopoly power in the publisher ad server market through anticompetitive and exclusionary conduct that (a) prevents competitors from accessing real-time bids from AdX, (b) allows Google to abuse the information shared from rivals to deprive those rivals of winning bids and thus market share, and (c) impose other restrictions that benefit Google at the expense of its rivals.

165.    Google's exclusionary conduct has foreclosed a substantial share of the publisher ad server market.

166.    Google's anticompetitive acts have had harmful effects on competition, including from Plaintiffs, and publishers, including Plaintiffs.

167.    The anticompetitive effects of Google's illegal tie and anticompetitive conduct outweigh any procompetitive benefits in the relevant market, or they can be achieved through less restrictive means.

168.    The anticompetitive effects of Google's illegal tie and anticompetitive conduct outweigh any procompetitive benefits in the relevant market, or they can be achieved through less restrictive means.

169.    As a direct and proximate result of Google's exclusionary conduct, Google has forced Plaintiffs to pay more for its publishing ad server and ad exchange product and services than Plaintiffs would have paid but for Google's unlawful conduct, paid Plaintiff less for open-web display ads sold using publishing ad server and ad exchange products, and caused Plaintiff to be paid less for open-web display ads it sold to others, which constitute antitrust injuries and direct harms to Plaintiffs'

business. Plaintiffs' injury is the type of injury the antitrust laws were designed to prevent and flows from that which makes Google's conduct unlawful.

### Second Claim for Relief:

### Monopolization and Maintaining Monopoly of Ad Exchanges for

### Open-Web Display Inventory in Violation of The Sherman Act § 2

170. Plaintiffs incorporate the allegations of paragraphs 1 through 161 above.

171. Ad exchanges for open-web display inventory is a relevant antitrust market, and Google has monopoly power in that market.

172. Google has unlawfully monopolized and now willfully maintains its monopoly power in the ad exchange market through anticompetitive and exclusionary conduct that (a) prevents competitors from accessing real-time bids from Google Ads and DV360, (b) allow Google to abuse the information shared from Google's publisher ad server to deprive other ad exchanges of winning bids and thus market share, and (c) impose other restrictions that benefit Google at the expense of its rivals.

173. Google's exclusionary conduct has foreclosed a substantial share of the ad exchange market.

174. Google's anticompetitive acts have had harmful effects on competition, including from Plaintiffs, and publishers, including Plaintiffs.

175. The anticompetitive effects of Google's illegal tie and anticompetitive conduct outweigh any procompetitive benefits in the relevant market, or they can be achieved through less restrictive means.

176. As a direct and proximate result of Google's exclusionary conduct, Google has forced Plaintiffs to pay more for its publishing ad server and ad exchange product and services than Plaintiffs would have paid but for Google's unlawful conduct, paid Plaintiff less for open-web display ads sold using publishing ad server and ad exchange products, and caused Plaintiff to be paid less for open-web display ads it sold to others, which constitute antitrust injuries and direct harms to Plaintiffs' business. Plaintiffs' injury is the type of injury the antitrust laws were designed to prevent and flows from that which makes Google's conduct unlawful.

COMPLAINT                                      34

***Third Claim for Relief:***

***Attempt to Monopolize the Ad Exchange Market for Open-Web***

***Display Inventory in Violation of The Sherman Act § 2***

177. Plaintiffs incorporate the allegations of paragraphs 1 through 161 above and bring this claim in the alternative to the second claim for relief.

178. Ad exchanges for open-web display inventory is a relevant antitrust market.

179. Google has market power in the ad exchange market and there is a dangerous probability that Google will obtain monopoly power in that market.

180. Through its anticompetitive conduct as alleged above, Google specifically intended and intends to maintain and expand its monopoly power in the market for ad exchanges.

181. Google's anticompetitive acts have had harmful effects on competition, including from Plaintiffs, and publishers, including Plaintiffs, and have a dangerously high probability of success and thus a dangerously high probability of reducing overall market activity.

182. As a direct and proximate result of Google's exclusionary conduct, Google has forced Plaintiffs to pay more for its publishing ad server and ad exchange product and services than Plaintiffs would have paid but for Google's unlawful conduct, paid Plaintiff less for open-web display ads sold using publishing ad server and ad exchange products, and caused Plaintiff to be paid less for open-web display ads it sold to others, which constitute antitrust injuries and direct harms to Plaintiffs' business. Plaintiffs' injury is the type of injury the antitrust laws were designed to prevent and flows from that which makes Google's conduct unlawful.

***Fourth Claim for Relief: Unlawful Tying in Violation of the Sherman Act § 1***

183. Plaintiffs incorporate the allegations of paragraphs 1 through 161 above.

184. Google tied AdX to its DoubleClick for Publishers, thereby coercing publishers to license DoubleClick for Publishers.

185. Google's DoubleClick for Publishers and Google's AdX are separate and distinct products in separate product markets.

COMPLAINT                                          35

186.    Google's AdX has monopoly power or, in the alternative, sufficient market power in the exchange market to coerce publishers to license DoubleClick for Publishers, thus restraining competition in the market for publisher ad servers.

187.    Google's tying arrangement affects a substantial volume of commerce in the publisher ad server and ad exchange markets and has substantially foreclosed competition in those markets.

188.    Google's tying arrangement has excluded competition in the publisher ad server and ad exchange markets, including from Plaintiffs, and caused Plaintiffs substantial harm, including Plaintiffs paying more for Google's publisher ad server and ad exchange products and services than Plaintiffs would have paid absent Google's tying arrangement, and being paid less for open web display advertising than it would have been paid absent Google's tying arrangement.

189.    Plaintiffs' injury is the type of injury the antitrust laws were designed to prevent and flows from that which makes Google's conduct unlawful. As a result of Google's unlawful conduct, Plaintiffs has suffered, and continues to suffer, monetary harm in an amount to be proved at trial.

### *Fifth Claim for Relief: Unlawful, Unfair and Fraudulent Competition in Violation of California Business & Professions Code §§ 17200, et seq.*

190.    Plaintiffs incorporate the allegations of paragraphs 1 through 161 above.

191.    Google's conduct in the publisher ad server and ad exchange markets has been found by a court in the United States District for the District of Eastern Virginia to have violated the Sherman Act and thus is unlawful under California's Unfair Competition Law. *Google LLC*, 778 F. Supp. 3d at 873.

192.    Google's conduct in the publisher ad server and ad exchange markets is also "unfair" and "fraudulent" within the meaning of California's Unfair Competition Law. Plaintiffs have standing to bring this claim because it has suffered harm and lost money as a result of Google's unlawful, unfair, and fraudulent business practices in the publisher ad server and ad exchange markets.

193.    Plaintiffs seek restitution under California's Unfair Competition Law for all of Google's deceptive auction changes that affected Plaintiffs' digital websites and properties,

COMPLAINT                                      36

representing the amount of money Google wrongfully obtained by means of its unlawful, unfair, and fraudulent business practices.

### Sixth Claim for Relief: Common Law Fraud

194.   Plaintiffs incorporate the allegations of paragraphs 1 through 161 above.

195.   Google falsely represented to Plaintiffs that various features of DoubleClick for Publishers and AdX would serve its own interests.  Google knew that its representations were false.  For example:

a.   Google justified Unified Pricing Rules because it supposedly "help[ed] . . . publisher[s] . . . simplify their decision-making, receive better matches, and increase revenue," but admitted internally that Unified Pricing Rules was "an opportunity to significantly limit the ability of publishers to set floor prices." *Google*, 778 F. Supp. 3d at 871.

b.   For years, in its DoubleClick for Publishers agreements, Google has represented to Plaintiffs that it does not use "data entered by [publishers] . . . that is not generally shared with buyers" — including header-bidding bids entered as line items in DoubleClick for Publishers — "for purposes of informing bids" made by Google. That is false for many reasons already discussed:  Google routinely trades on inside information not shared with other buyers.

c.   In its implementation of dynamic revenue share, Google intentionally hid from publishers that it was altering the revenue shares and floor prices in auctions for their inventory.  Prior to the introduction of Unified Pricing Rules, Plaintiffs intentionally set price floors to maximize their revenues and control the advertising inventory they sold.  Absent Google's omission, Plaintiffs would have changed their price flooring strategy.

d.   Google falsely represented that AdX ran a true second-price auction, when in reality, Project Bernanke and its variants converted AdX's auction into a manipulated auction. Absent that false representation, Plaintiffs would have changed their auction strategy.

e.   Google intentionally withheld information regarding Bell v.2 from publishers. Specifically, Google did not inform Plaintiffs that if publishers sent multiple calls to

AdX, Google would fix the bids those publishers receive below an artificially low cap. To the contrary, Google for years told publishers that multi-calling was an appropriate auction strategy.

f. Google represented to Plaintiffs that it had eliminated Last Look advantages in 2019. But in fact, Google's Last Look, in the form of Minimum Bid to Win, persists to this day.

196. Google intended to induce Plaintiffs to rely on its misrepresentations.

197. Plaintiffs reasonably relied on Google's misrepresentations to enact and keep in place various features of DoubleClick for Publishers and AdX, and to adopt strategies to monetize ad inventory. For example, for years, Plaintiffs set their monetization strategy on the belief that Google was running a fair second-price auction. But because of Bernanke, dynamic revenue share, and other secret auction manipulations, that was false.

198. As a result of that reliance, Plaintiffs sustained and continues to sustain significant revenue losses.

### *Seventh Claim for Relief: Unjust Enrichment*

199. Plaintiffs incorporate the allegations of paragraphs 1 through 161 above.

200. Google was unjustly enriched and benefited by manipulating its online ad tech auctions. For years, Google employed Dynamic Allocation, Enhanced Dynamic Allocation, Project Bernanke, Unified Pricing Rules, and other schemes to monopolize the ad-serving and exchange markets, and to depress prices for publishers' inventory. In executing these schemes, Google used DoubleClick for Publishers to prevent publishers from soliciting competitive bids from rival exchanges and rigged AdX's bids by trading on inside information.

201. Google's conduct was not within the scope of Plaintiffs' contracts with Google. Google's deceptions extend beyond the specific representations it made in its contracts with Plaintiffs, and concern details that were not disclosed or within the subject matter of the contracts. For example, Google's contracts do not disclose or suggest that Google would depress bids for publishers despite promises of running a fair second- or first-price auction (*e.g.*, Bernanke and Alchemist) or that Google

COMPLAINT                                          38

would secretly depress bids on non-Google exchanges to coerce publishers to sell inventory to AdX (*e.g.*, Project Poirot).

202. The enrichment and benefit to Google came at the expense of Plaintiffs. Plaintiffs relied on Google to operate honest advertising auctions to facilitate the sale of display advertising inventory. By manipulating auctions run by DoubleClick for Publishers and intermediated through AdX, Google artificially depressed the price of Plaintiffs' display advertising inventory to Google's benefit. For example, as Google acknowledged in a study on Project Bernanke, the effect of that auction manipulation alone resulted in up to a 40% reduction in publishers' revenue. Plaintiffs were unfairly deprived of revenue from these auction manipulations.

203. Equity and good conscience require that Google make restitution to Plaintiffs. For years, Google has represented that its ad serving practices were in Plaintiffs' interests. Google staff have repeatedly acknowledged internally that these representations were false, that publisher inventory pricing was reduced, and that its auction manipulations were "inherently unfair." Fairness thus requires that Google make restitution to Plaintiffs.

## X.     PRAYER FOR RELIEF

204. To remedy Google's unlawful acts as alleged above, Plaintiffs request that this Court:

a. Enter a judgment that Google's conduct as alleged in each Count violates Section One or Section Two of the Sherman Act and California law;

b. Enter an injunction to stop Google from continuing to violate the Sherman Act and California law and enter relief to restore competition and stop Google's deceptive practices;

c. Enter a judgment for restitution, punitive damages and/or three times the damages actually sustained by Plaintiffs as determined by a jury, pursuant to 15 U.S.C. § 15(a);

d. Order Google to pay Plaintiffs' reasonable attorneys' fees, costs and disbursements for this lawsuit;

e. Order Google to pay Plaintiffs' post-judgment interest on the judgment entered by the Court;

f. Award other and further relief as this Court deems just and proper.

Dated: April 13, 2026

Respectfully submitted,
SPERLING KENNY NACHWALTER, LLC


 /s/ Anna T. Neill
Anna T. Neill, Esq. (SBN 270858)

Four Seasons Tower
1441 Brickell Avenue, Suite 1100
Miami, FL 33131
Telephone:   (305) 373-1000
Facsimile:   (305) 371-1861
Email:          aneill@sperlingkenny.com

*Attorney for Plaintiffs MH Sub I, LLC, d/b/a
Internet Bands, WebMD Health Corp.,
and WebMD LLC*

**DEMAND FOR JURY**

Plaintiffs MH Sub I, LLC, d/b/a Internet Bands, WebMD Health Corp., and WebMD LLC hereby request a trial by jury for all issues properly submitted to a jury.

Dated: April 13, 2026

Respectfully submitted,
SPERLING KENNY NACHWALTER, LLC

 /s/ Anna T. Neill
Anna T. Neill, Esq. (SBN 270858)

*Attorney for Plaintiffs MH Sub I, LLC, d/b/a
Internet Bands, WebMD Health Corp.,
and WebMD LLC*

COMPLAINT                    41